## In Re Anonymous No. 82 D.B. 84

Disciplinary Board Docket No. 82 D.B. 84.

To The Honorable Chief Justice and Justices of The Supreme Court of Pennsylvania

MUNDY, *Member*, June 19, 1985—Pursuant to Rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania (board) herewith submits its findings and recommendations to your honorable court with respect to the within petition for discipline.

## I.   HISTORY OF PROCEEDINGS

Respondent, whose law offices are located in [   ] County, and whose practice encompasses both [   ] and [   ] Counties, was admitted to the practice of law in the Commonwealth of Pennsylvania in 1976.

On October 2, 1984, a petition for discipline was filed with the Disciplinary Board of Pennsylvania by which respondent was charged with violations of the Code of Professional Responsibility arising out of nine separate matters handled by respondent. In each instance, respondent was charged with violations of Disciplinary Rule 1-102(A)(4), dealing with conduct involving dishonesty, fraud, deceit or misrepresentation, and Disciplinary Rule 6-101(A)(3),

dealing with conduct involving neglect of a legal matter entrusted to an attorney.

On November 20, 1984, the Office of Disciplinary Counsel entered into a stipulation with respondent through respondent's counsel by which the allegations of neglect arising from the way each of the nine matters at issue were handled by respondent were essentially admitted.

On January 9, 1985, a hearing was held before hearing committee [ ] consisting of [ ], pursuant to the Pennsylvania Rules of Disciplinary Enforcement. At the hearing, during which respondent was represented by counsel, evidence offered by the Office of Disciplinary Counsel in support of the charges of violation of D.R. 1-102(A)(4), by which respondent was accused of conduct involving dishonesty, fraud, deceit or misrepresentation, was essentially undisputed by respondent. This evidence together with the aforementioned stipulation provided the basis for the unanimous finding on behalf of the hearing committee that respondent was guilty of neglect with respect to all nine matters which were the subject of the petition for discipline, and guilty of conduct involving dishonesty, fraud, deceit or misrepresentation in eight of the nine matters.

The hearing committee then considered evidence relative to the type of discipline to be imposed, and thereafter received memorandums from each party on the type of discipline warranted under these circumstances. Thereafter, the hearing committee unanimously recommended that respondent be suspended by the Supreme Court of Pennsylvania for a period of four months.

Neither side took exception to the findings or recommendations of the hearing committee and the

matter was referred to the Disciplinary Board of the Supreme Court of Pennsylvania on April 26, 1985.

## II. FINDINGS OF FACT
### [A] Matter

In March of 1983, respondent was retained by Mr. and Mrs. [A] to represent them in the purchase of real estate from [B]. Respondent was to search the title, certify it, obtain title insurance, conduct the closing and record the deed. All fees and expenses were paid at the closing, including the amount necessary to pay real estate taxes on the property for the year 1983. Thereafter, respondent inexcusably delayed recording the deed until Mrs. [A] threatened to report him to the bar association. He also failed to advise [A] when the deed was finally recorded. In addition, respondent failed to pay the real estate taxes, the funds for which he held in his escrow account. After learning that the taxes were delinquent, [A] paid the taxes and requested respondent to repay them. Respondent paid them the funds he held in escrow. However, respondent neglected to obtain the title insurance policy until February 20, 1984, nearly 11 months after he was retained to do so. Because of the delays caused by respondent, the costs of construction for the home [A] intended to build on the property were substantially increased.

### [C] Matter

In July of 1982, [C] employed respondent to transfer real estate situated in Trumbull County, Ohio, a county near [ ] County, Pa., where respondent maintains his office. This transaction required the preparation of two deeds and recording

them in Trumbull County, Ohio. The deeds were prepared and executed in early October of 1982, but have never been recorded and remain at this time in respondent's files. Respondent had advised [C] that the matter would be completed within a couple of months. [C] asked respondent in November of 1982 and in January of 1983 about the deeds and was told each time that respondent had received nothing back from the recorder in Ohio. [C] had also been told by respondent that the deeds would be "in any day now" and "he was working on it". Respondent also promised [C] that he would write to the recorder in Trumbull County to determine the reason for the delay. On one occasion, respondent advised [C] that he had written such a letter, but that statement was also untrue. During this entire period, the deeds had not been sent to the recorder of Trumbull County for recording. Even after [C] complained to the Disciplinary Board, respondent misrepresented to him that the deeds had been returned from Ohio unrecorded. Respondent admits that he misrepresented to [C] that he had sent the deed to Ohio. He also concedes he did not know what to do with the deeds and did not inquire of anyone for assistance.

## [D] Matter

Respondent was retained by Mr. and Mrs. [D] to represent them in a real estate transaction. Respondent was to search the title, attend the closing and obtain title insurance. The closing was held March 15, 1983. At that time, [D] paid all costs, taxes, recording fees, insurance premiums and attorneys' fees. Respondent was to record the deed, pay the real estate taxes and obtain title insurance. Respondent told [D] they would receive the deed in ap-

proximately one month, since it would be mailed from Rochester, New York.

In May of 1983, when [D] asked about their deed and title insurance, respondent implied that he had taken the necessary action to record the deed and to secure the title policy. In fact, respondent had done neither. In June, 1983, [D] were advised by an employee of the recorder of deeds that the deed had not been recorded. When Mrs. [D] told respondent this, he again implied that he had done what was necessary and would look into the matter, suggesting that the problem was with the recorder of deeds. Respondent also told Mrs. [D] that the recorder had apparently lost the deed or it was lost when sent to Rochester, New York, to be filmed. On another occasion, [D] again asked respondent about the deed, and he again said he would "look into the matter". Hearing nothing from him, [D] went to the office of the recorder of deeds, found that the deed had not been recorded and that the recorder did not send deeds away for filming. Mrs. [D] told respondent that if they did not get the deed within one week, they would consult with another attorney. The following week, the deed was recorded.

Thereafter, having not received their title insurance policy, [D] called respondent who said he needed the deed book volume and page of the recorded deed, which he said was not available to him. In July, 1983, [D] learned that the real estate taxes, funds for which had been given to respondent at the time of the closing, were not paid. On August 25, 1983, Mrs. [D] gave respondent the deed book volume and page where the deed was recorded and demanded that he immediately obtain their title insurance policy and pay the taxes. Over a month later, Mrs. [D] told respondent that she would retain other counsel if the title policy and tax receipts were not

received in a week. After not hearing from respondent, [D] retained another attorney who wrote respondent asking him to contact him. Respondent told the other attorney that he would immediately take care of the matter and notify [D]. He admits that he told the other attorney that he had paid the taxes, when he had not.

On November 1, 1983, respondent told Mrs. [D] that the borough taxes were paid and that he had shown a cancelled check to the tax collector. In fact, the taxes had not been paid and respondent had not seen the tax collector as he had reported. When Mrs. [D] asked respondent to show her the cancelled check, he indicated he did not know where it was. However, he told her that if he found the cancelled check, he would stop payment on it, but he did not explain how payment on a cancelled check could be stopped. [D] filed a complaint with the Disciplinary Board and a formal letter of allegations was sent to respondent on January 26, 1984. On March 19, 1984, respondent replied that he sent checks to pay the taxes, which were paid on March 22, 1984, and was delivering title opinions to [D] and to the board. As of the time of the hearing in this matter, [D] had not yet been furnished with title insurance. Respondent concedes that all that was needed for the insurance to issue was the easily obtainable information on the plan book volume and page of the plan where the real estate is located.

### [E] Matter

[E] retained respondent on March 19, 1983, to represent her in a divorce action which had already been filed, but in which service had not been obtained on her husband. She had been separated over three years at that time. Respondent advised her the divorce decree could be obtained in approxi-

mately three months. In July, several months after she retained him, [E] called respondent about her divorce, and he asked her for more time. This conversation was repeated several weeks later. In August of 1983, [E] asked respondent if she could go through with plans to remarry in September of 1983. He told her that she could. [E] bought invitations, food and drinks and ordered flowers, but had to cancel the wedding because her divorce action had not been concluded. Even though [E] called him many times, respondent took no action on her divorce. She wrote him in December of 1983 about her divorce and of her plans to remarry in January of 1984. He again told her she could remarry. At one point, respondent told her that he had difficulty serving her husband with the complaint. [E] then contacted her husband, who said he would consent to the divorce and was unaware of any efforts to serve him with the divorce complaint. Respondent took no further action until receiving a D.B.-7 letter from the Disciplinary Board. He then filed the divorce complaint, and on May 29, 1984, obtained a decree.

### [F] Matter

[F], now [    ], retained respondent in a divorce action. A complaint was filed December 30, 1982, and after attempts at counseling and negotiations, a marriage settlement agreement was concluded and executed, along with affidavits of consent, at respondent's office on September 7, 1983. Respondent promised to promptly file the documents with the court, but did not do so. In October of 1983, respondent told [F] that the affidavits had been filed. A few weeks later, [F] learned that the documents had not been filed. When asked about this, respond-

ent told [F] that she didn't find them because the papers "travel" between buildings. The rules of court applicable to the proceeding require plaintiff's counsel to carry the file from the prothonotary's office to the chambers of the judge. On three occasions, respondent told [F] that the documents had been filed when they, in fact, had not been and were not filed until after [F] complained to the Disciplinary Board and a D.B.-7 letter was sent to respondent on February 1, 1984. A divorce was granted February 23, 1984.

### [G] Matter

In April or May of 1981, respondent agreed to represent [G] on a contingent fee basis in a claim arising from water damage to his residence caused by recurring flooding problems. Respondent told [G] that suit was to be filed against [   ] Township, [   ] County and [   ] Borough. Thereafter, [G] wrote respondent and spoke with him a number of times asking about the delay in the case and telling him, in September of 1981, that more flood damage had occurred. Although suit had not been filed, respondent told [G] that suit had been filed against the named municipalities in the amount of $30,000. He further indicated that the delay in the case was due to the backlog of cases in the courts.

In the spring of 1982, [G] learned that no suit had been filed in [   ] County. When he told respondent that he knew that no suit was filed in the county, respondent told him that it was a federal court action. Respondent later told [G] that the judge had agreed to an amendment based on the "storm water bill". Respondent also told [G] that the case would be coming up in the spring, and then told him it would be reached before Christmas. Respondent

promised to reply to [G]'s letters, but did not do so.

Respondent has filed no suit in state or federal court on behalf of [G]. The Storm Water Management Act is the legislation [G] referred to as "the storm water bill". That statute is an act of the Pennsylvania legislature.

Respondent does not dispute [G]'s testimony and admits that he told [G] that suit was filed when no suit had been filed.

### [H] Matter

In October of 1982, Mr. and Mrs. [H] retained respondent to represent them as a result of an assault on Mr. [H] by neighbors that occurred on October 10, 1982. Respondent was to be paid $50 an hour for his efforts to have the accused persons prosecuted in a criminal action. Respondent was also to represent the [H] in a civil suit and was to be paid a contingent fee of 40 percent of the amount obtained on their behalf.

After a series of meetings with an assistant district attorney, Mr. [H] asked respondent to proceed with the criminal charges promptly. After six weeks, Mr. [H] inquired about the matter and respondent told him that criminal charges were filed. Several weeks later, respondent told Mr. [H] that the delay in the criminal proceedings was due to the court's backlog. He later told Mr. [H] that a hearing was scheduled for May of 1983. In May of that year, respondent finally admitted to Mr. [H] that criminal charges had not been filed. He blamed a change in the staff of the district attorney's office for the failure to file the criminal complaint. However, respondent had simply not contacted the district attorney and did not realize that the criminal action could be instituted without going through that of-

fice. A hearing was held by a district magistrate on January 19, 1984, and the [H]'s criminal complaint was dismissed.

While meeting with an assistant district attorney, respondent told her that the civil complaint for the [H] had been filed. He reiterated that to Mr. [H] while preparing for the magistrate's hearing. After the criminal charges were dismissed, the magistrate advised the [H] that a civil complaint could be filed. Respondent told the magistrate he had already done so.

On January 20, 1984, Mr. [H] learned while at the prothonotary's office that the civil action had not been brought. He then discharged respondent.

Respondent indicated that he was telling the [H] what they wanted to hear when he misrepresented to them the status of the civil proceedings.

## H. [I] Matter

In May of 1979, [I] retained respondent to represent him in a claim against a real estate broker for breach of contract for the sale of real estate. Respondent agreed to do so for a contingent fee, and [I] paid the initial court costs. Respondent never filed the action and admits that sometime in 1983, he told [I] that the suit had been filed. [I] learned at the prothonotary's office that no suit was brought.

On June 6, 1982, [I] was named as a defendant in an action to collect an unpaid bill of a dentist in the amount of $925. [I] asked respondent to defend him and to assert a claim against the dentist for professional malpractice in connection with the services that were the subject of the collection action. However, respondent took no steps on [I]'s behalf and a default judgment was entered against him. After the default judgment was entered, respondent told

[I] that he would "take care of it". Nonetheless, on July 14, 1983, interrogatories in aid of execution were propounded to [I]. Respondent was to assist in preparation of the answers to those interrogatories, but they were not answered, and on October 6, 1983, a petition was filed to cite [I] for contempt of court for failure to respond to the interrogatories. Respondent again said that he would "take care of it". On March 1, 1984, a second contempt petition was filed against [I]. In the only written communication between respondent and [I], a letter dated March 15, 1984, respondent was critical of [I] but also misrepresented to him that his counterclaim or separate suit against defendant could be affected by the failure to answer interrogatories. Respondent had not filed and never filed a counterclaim or separate action on behalf of [I] against the dentist.

In May of 1984, respondent personally paid the dentist's attorney $500 on the judgment against [I]. Respondent did not tell [I] of that payment. Subsequently, respondent told the dentist's attorney that [I] would pay no more than the $500 previously paid, misrepresenting to the attorney that [I] provided the funds for that payment.

A third contempt petition was filed against [I], but respondent never advised him of it. [I] filed a complaint with the Disciplinary Board and a D.B.-7 letter as sent to respondent on July 17, 1984. On August 13, 1984, respondent satisfied the balance owing on the judgment against [I]. No malpractice claim was asserted by respondent for [I].

## I. [J] Matter

In January of 1982, [J] retained respondent to represent her in a divorce action which had already been filed by another attorney. [J] and her husband

had been separated 20 years. The only matter to resolve in the proceeding was the divorce. [J] paid respondent his fee and the costs for advertising the action, since her husband had not responded to correspondence to him at his last known address in the State of Delaware. Respondent told [J] she would have a decree in four to five months. Although [J] called respondent on numerous occasions, no information was given to her until respondent told her to meet him for a hearing in her case at the Family Division of the court of Common Pleas of [ ] County on September 30, 1982. [J] and her sister met respondent for the hearing. He told her that since her husband was not there, she would not have to appear before the judge. He left [J] and her sister for a substantial period of time and, when he returned, he told them that the divorce had been granted. In fact, no hearing was scheduled or conducted. Respondent's purpose in going to the Family Division was to find out what to do.

Subsequently, when [J] called respondent about her divorce decree, she got a variety of responses. He told her that she should be getting the decree soon, that the judge was busy campaigning for election and that he would look into the matter. [J] was able to contact her husband, who indicated he was willing to cooperate in the proceeding. He signed and returned to respondent in the spring of 1983 an affidavit of consent and acceptance. In September of 1983, after [J] had made additional inquiries about her divorce, respondent gave her a document that appeared to be a conformed copy of a divorce decree which bore the date September, 1983, and a typed conformed signature "s/[ ] J". When he gave her this document, he told her that the divorce had been granted and that the copy he was showing her was similar to what she would be getting, but that

the actual decree would have a gold seal. Respondent admits that the use of the decree form was a delaying tactic. The divorce proceeding has not yet been concluded. A week and a half prior to the disciplinary hearing in this matter, respondent referred [J] to the attorney who is representing him in these proceedings.

## III. CONCLUSIONS OF LAW

A. [A] Matter — Respondent was in violation of Disciplinary Rule 6-101(A)(3), dealing with conduct involving neglect of a legal matter entrusted to an attorney.

B. [C] Matter — Respondent was in violation of Disciplinary Rule 1-102(A)(4), dealing with conduct involving dishonesty, fraud, deceit or misrepresentation; and further was in violation of Disciplinary Rule 6-101(A)(3), dealing with conduct involving neglect of a legal matter entrusted to an attorney.

C. [D] Matter — Respondent was in violation of Disciplinary Rule 1-102(A)(4), dealing with conduct involving dishonesty, fraud, deceit, or misrepresentation; and further was in violation of Disciplinary Rule 6-101(A)(3), dealing with conduct involving neglect of a legal matter entrusted to an attorney.

D. [E] Matter — Respondent was in violation of Disciplinary Rule 1-102(A)(4), dealing with conduct involving dishonesty, fraud, deceit, or misrepresentation; and further was in violation of Disciplinary Rule 6-101(A)(3), dealing with conduct involving neglect of a legal matter entrusted to an attorney.

E. [F] Matter — Respondent was in violation of Disciplinary Rule 1-102(A)(4), dealing with con-

duct involving dishonesty, fraud, deceit, or misrepresentation; and further was in violation of Disciplinary Rule 6-101(A)(3), dealing with conduct involving neglect of a legal matter entrusted to an attorney.

F. [G] Matter — Respondent was in violation of Disciplinary Rule 1-102(A)(4), dealing with conduct involving dishonesty, fraud, deceit, or misrepresentation; and further was in violation of Disciplinary Rule 6-101(A)(3), dealing with conduct involving neglect of a legal matter entrusted to an attorney.

G. [H] Matter — Respondent was in violation of Disciplinary Rule 1-102(A)(4), dealing with conduct involving dishonesty, fraud, deceit, or misrepresentation; and further was in violation of Disciplinary Rule 6-101(A)(3), dealing with conduct involving neglect of a legal matter entrusted to an attorney.

H. [I] Matter — Respondent was in violation of Disciplinary Rule 1-102(A)(4), dealing with conduct involving dishonesty, fraud, deceit, or misrepresentation; and further was in violation of Disciplinary Rule 6-101(A)(3), dealing with conduct involving neglect of a legal matter entrusted to an attorney.

I. [J] Matter — Respondent was in violation of Disciplinary Rule 1-102(A)(4), dealing with conduct involving dishonesty, fraud, deceit, or misrepresentation; and further was in violation of Disciplinary Rule 6-101(A)(3), dealing with conduct involving neglect of a legal matter entrusted to an attorney.

## IV. DISCUSSION

Clearly, under the facts presented, respondent's conduct reflects a pattern of neglect which requires

the imposition of discipline. The period of time during which these offenses occurred encompassed at least five years, beginning in May of 1979, and extending through the time of the hearing when some of the matters entrusted to respondent still remained outstanding. Particularly troublesome is the fact that in some of the instances respondent acted only after a client complained to the Office of Disciplinary Counsel, and in other instances respondent failed to act even after such complaints were made. In addition, respondent has a prior instance of neglect and misrepresentation with respect to a divorce proceeding which resulted in his receiving an informal admonition.

In his defense, respondent offered evidence that his law partner's death in October of 1983, and a rather severe manic depressive psychological disorder suffered by his wife, had added a great deal of stress to his life and affected his professional career adversely. He offered the testimony of [K], Ph.D., a psychologist who had seen respondent on five occasions prior to the hearing. Dr. [K] was candid in his assessment of respondent's condition testifying that he was not attempting to "exempt him from responsibility", but to rather to attempt to explain the personality of the individual. Dr. [K] testified that respondent was a "passive/aggressive personality", who had developed the capacity to deny he was acting improperly in his practice, and delude himself into believing that he was at all times dedicated to the law and his clients. Dr. [K] concluded that respondent's personality pattern was immature, inappropriate, and totally inconsistent with being a professional. It was the opinion of Dr. [K] that respondent should not be excused for his behavior because he had allowed himself to indulge in this personality pattern. Dr. [K] stated that respondent is

responsible for what he has done and should be held accountable.

On the other hand, Dr. [K] testified that it is possible for a person such as respondent to break his personality pattern, assuming the prerequisite motivation to do so, and access to professional guidance. He stated that he sensed a change occurring in respondent's behavioral pattern because of the impact of the disciplinary procedures at hand and cited as examples of the change in conduct the fact that respondent has hired a paralegal and has begun to refer cases to other attorneys. Although he cannot predict change with certainty, it is the opinion of this professional witness that respondent will alter his behavior pattern in the future. Perhaps most importantly, Dr. [K] advised the committee that respondent does not want to excuse or exonerate himself, but wants to accept responsibilty for his behavior. The sincerity of this assessment is verified by the stipulation with respect to these charges which was voluntarily entered into by respondent.

The board was duly impressed with Dr. [K]'s refreshingly candid appraisal of respondent's conduct. Furthermore, it was to his credit that respondent was cognizant of his need of professional help, and took the necessary steps to avail himself of professional guidance. In addition, the board recognized that respondent's attitude throughout these proceedings, as evidenced by both the stipulation and the way in which the hearings were conducted, was one of realization of his wrongdoing and remorse.

Nevertheless, the board was greatly concerned with the pattern of dishonesty, deceit and misrepresentation which accompanied respondent's pattern of neglect. We were particularly distressed by respondent's resort to using a forged conformed copy

of a divorce decree in the [J] matter (item I) on which was typed the conformed signature "s/[  ] , J." Though this might be the most flagrant example, it was apparent that respondent was capable of using almost any form of fraud or deceit to cover up his pattern of neglect throughout the period during which these charges arose. The board felt strongly that the forging of a court document constituted a most flagrant violation of the Disciplinary Rules, and in and of itself warranted a stronger sanction than that recommended by the hearing committee.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that respondent be suspended from the practice of law in the Commonwealth of Pennsylvania for a period of one year, and further recommends that the costs of these proceedings be paid by respondent.

Mr. Tumolo dissents and would recommend a four month suspension.

Prof. Keck and Mr. McDonald did not participate in the adjudication.

## DISSENTING OPINION

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

TUMOLO, *Member,* June 19, 1985—The issue presented in the case of [Respondent] is how to discipline respondent while advancing the rehabilitation the record demonstrates he has begun. The hearing committee,[1] without exceptions being filed by either party, found this would be achieved by a four month suspension. I agree and would accept

---

1. [  ], Esq., [  ], Esq., and [  ], Esq.

the recommendation of the committee, along with advance notice to respondent that two additional requirements set forth below must be met before he can be reinstated.

The conclusions on the disciplinary offenses reached by the hearing committee and accepted by the board are the result of a stipulation and unrefuted testimony.

Respondent set out three reasons why the pattern of misconduct occurred. First, his wife has a condition diagnosed as manic-depression. Until this was determined to be an organic problem which could be treated with drugs it caused a substantial shift in the duties of child and home care. Second, respondent asserted that the death of his law partner increased the pressure on him and eliminated access to an experienced attorney. There were areas in which respondent did not have sufficient expertise to accomplish the clients' objectives.[2] His law partner, being much his senior, could have helped. But respondent did not ask his partner for help. And his failure to ask for aid leads to respondent's third reason for his conduct. Dr. [K] diagnosed respondent as having a "passive-aggressive personality" which led to his desire to please everyone while at the same time denying his own faults. The records demonstrates this as a treatable personality disorder. It is clear that while the first two reasons for respondent's conduct would have created pressure on any practitioner, those problems would have been satisfactorily dealt with without the psychological problem. Prior to the hearing, respondent had seen Dr. [K] five times, and expressed the intention of continuing as long as necessary. In fact, the presentation before the hearing committee was substan-

2. The [C] and [J] matters are at least two examples.

tially shortened because of the stipulation which both Dr. [K] and his patient favored. At page 180 of the transcript, Dr. [K] testified that he does not believe that respondent will ever fall into this disciplinary pattern of conduct again. Standing alone, even the frank testimony of this expert would not receive substantial weight. But the record demonstates respondent's admission of a problem that he must do something about. He has moved in a constructive way to rehabilitate himself. He has hired a paralegal and put his office in much better operating order. He has begun to refer cases where his expertise is insufficient. He is continuing his treatment with Dr. [K].

I would recommend:

1. Accepting the recommendation of the hearing committee for a four month suspension;

2. The imposition of the cost of these proceedings upon respondent;

3. Giving respondent advance notice that a condition for reinstatement will be that he produce proof that he has faithfully continued or completed the therapy program with Dr. [K]; and,

4. That as an additional precondition to reinstatement, he must produce an inventory and status report on every open file in his possession.

## ORDER

NIX, *C.J.*, And now, this August 2, 1985, upon consideration of the recommendation of the Disciplinary Board and board member's dissenting opinion dated June 19, 1985, it is ordered that [Respondent] be and he is suspended from the Bar of the Commonwealth for a period of one year, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall

pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Flaherty dissents and would issue a rule to show cause why respondent should not be disbarred.

